RECEIVED
OCT - 5 2005
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| SIMEON T. LASSEIGNE | * | CIVIL ACTION NO. 03-1388 |
| VERSUS | * | JUDGE MELANÇON |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE HILL |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Simeon T. Lasseigne, born July 6, 1961, filed an application for disability insurance benefits on February 26, 2001, alleging disability since April 25, 1997, due to knee surgery and knee problems.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:

**(1) Records from Our Lady of Lourdes Hospital dated August 6, 1997 to February 18, 1998.** On August 6, 1997, Dr. Robert Morrow, Jr. performed a left knee arthroscopic medial meniscectomy. (Tr. 168). The diagnosis was a left knee posterior medial meniscus tear.

On December 18, 1997, Dr. Morrow performed another left knee arthroscopic medial meniscectomy after a recurrent medial meniscus tear. (Tr. 172).

**(2) Records from Dr. Michael Brunet dated October 29, 1998 to August 11, 1999.** On October 29, 1998, claimant reported that he had fallen off of a ladder offshore and injured his knee about one and a half years prior. (Tr. 187). He was status-post scope and meniscectomies. He complained of difficulty squatting, inability to stand for any length of time, and feeling that his knee wanted to "pop out."

On examination, he had no effusion and 20% quadriceps atrophy. He had mildly increased external rotation of his left knee at 90 degrees, an equal amount of external rotation, and negative posterior drawer. Dr. Brunet's impression was medial compartment arthritis, mild posterolateral rotary instability. He recommended continued strengthening of his quadriceps.

On April 5, 1999, claimant complained of subluxation and intermittent swelling, but denied actual locking. (Tr. 185). Dr. Brunet's impression was posterolateral corner instability of the left knee with varus deformity. He recommended high tibial osteotomy.

Dr. Brunet performed a left upper tibial valgus osteotomy on May 7, 1999. (Tr. 223). On May 13, 1999, claimant's knee was healing well. (Tr. 183). He was without complaints on June 9, and was started on formal physical therapy. (Tr. 182).

On August 11, 1999, claimant had been performing PT as instructed. (Tr. 178). He had significant pain over the anterior aspect of his knee joint. On examination, he had significant patellar tendonitis which was limiting his activities. He was instructed to continue PT and use a bike at home as well.

### (3) Records from McLeod-Trahan-Sheffield Physical Therapy Services dated September 6, 1997 to October 1, 1999.[1]

In a Functional Capacity Evaluation ("FCE") dated July 15-16, 1998, claimant was found to be able to perform medium work. (Tr. 192). Kin-Con testing showed left knee extensor weakness by 31% eccentrically and 44% concentrically compared to the right. Claimant had pain and instability and limited left knee strength.

---

[1] Physical therapists qualify as "other sources" under 20 C.F.R. § 404.1513(e) which sources may be considered but are entitled to significantly less weight than "acceptable medical sources." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).

On October 1, 1999, Clark LeBlanc, PT reported that claimant's final visit was on September 20, 1999, at which time he had received 37 visits since June 11, 1999. (Tr. 188). His response to treatment was fair.

**(4) Records from Dr. Robert Morrow dated October 5, 1998 to October 17, 2001.** On November 25, 1998, claimant complained that he still got a little sense of instability with his left knee. (Tr. 233). Examination revealed left thigh atrophy, no effusion, medial joint line tenderness and stable ACL, PCL, MCL and LCL.

Dr. Morrow opined that claimant would best be suited for light or medium work. He stated that claimant could be released to look for a job. He assigned claimant a 10% permanent impairment of his left knee, which equated to about a 4% impairment of the whole person. He restricted claimant from heavy manual labor that required repetitive squatting, stooping, crawling, and lifting more than 50 pounds, particularly on a repetitive basis. He recommended that claimant continue to do strengthening exercises.

On January 7, 1999, claimant reported that he had a job with a pool company and was able to perform it. (Tr. 232). He said that the only thing that gave him trouble was crawling underneath the edge of the shell to get into the open region of the pool. He had been wearing his left knee brace most of the time.

On examination, claimant was building up some quad strength and bulk on the left side. He was able to cause some subluxation by circumduction of the knee. He still had a slightly positive left-sided anterior draw sign. He had a good range of motion without effusion. Dr. Morrow recommended that claimant continue with his strengthening procedures and working with limited lifting and squatting.

On March 9, 1999, claimant had some instability due to an intenuation of the anterior cruciate ligament. (Tr. 230). He said that he had had a sense of occasional popping out of place where he had to push it back in. On examination, he had better thigh bulk and circumference on the right side than the left. He had generalized atrophy of the left lower extremity. Range of motion of the knee was full with no effusion.

X-rays showed a little narrowing of the medial joint line of the left knee. There were no definite osteophytes or subchonral cysts. Claimant did not have any evidence of degenerative changes on the femur, tibia or patella margins. (Tr. 231).

Dr. Morrow recommended that claimant further increase the bulk and strength of the quadriceps and hamstrings. He noted that claimant could possibly need some reconstructive surgery in the future. He opined that claimant was able to tolerate his working for the pool company.

On April 1, 1999, claimant had increased pain and swelling after working an 11-hour day. (Tr. 228). Following a discussion with Dr. Brunet, Dr. Morrow agreed that claimant needed surgical stabilization of the posterior lateral corner of his left knee, which was performed on May 7. (Tr. 225, 228).

On February 3, 2000, claimant was status-post left upper tibial osteotomy and continued to have difficulty with his left knee. (Tr. 219). He had attempted to work as a helper for a sheet rocking crew, but was unable to carry the 50-60 pounds buckets of mud. He had tried to do some crawfishing, but had accidently slipped and twisted his left knee. He reported that his knee had swollen on several occasions and that it "sort of pops."

On examination, claimant had some anterior laxity of the tibia and a slight positive pivot shift test. He was stable in full extension of the lateral collateral and medial collateral ligament. He did not have a definite effusion, and maintained a good range of motion of the left knee.

Dr. Morrow recommended that claimant be cautious about his use of the left knee, particularly with sudden twisting movements and walking on uneven ground. He refilled claimant's prescriptions for Lortab and Soma.

On May 2, 2000, claimant continued to have a sense of occasional popping in the left knee. (Tr. 218). On examination, he had full range of motion of the left knee.

The valgus osteotomy had healed. He had some laxity in the left knee, but no effusion. He had excellent quads and hamstring bulk.

X-rays showed a 12-13 degree anatomical valgus positioning of the tibia relative to the femur. On the right side, he had about neutral to 2 degrees of valgus. He had good positioning with no evidence of any nonunion.

Dr. Morrow recommended that claimant continue with his activities to tolerance, use analgesic medication, use his brace, and continue his self-directed exercise program. He opined that claimant was capable of light to moderate work. He stated that he would refrain from reconstructing claimant's ACL.

On June 7, 2001, claimant reported that he had slipped on his steps at home the previous day and fell, causing excruciating pain to the left knee. (Tr. 210). Since then, the pain had subsided and there was no increase in instability or effusion. Dr. Morrow stated that claimant could continue with his medication and activities.

On September 6, 2001, claimant had been wearing his brace and taking Celebrex. (Tr. 207). He continued to have discomfort with long periods of standing and walking. He stated that he had tried working as an alligator meat filleter, but found that standing on the cement floor caused discomfort. He was taking one or two Lortab a day for discomfort.

On examination, claimant had some atrophy of the left thigh. His left knee range of motion was 0-128 degrees, and right knee range was 0-144 degrees. In full extension, he had some laxity of the left knee, but none on the right. The left lower extremity was neurovascularly intact. He had some tenderness of the anterior lateral joint line. There was no effusion of the left knee.

Dr. Morrow stated that claimant should continue with his activities and medications. He recommended that claimant continue with his brace and strengthening the left quadriceps and hamstrings with a resistive rubber band device. He also opined that claimant should continue his attempts at trying to find some comfortable line of employment. (Tr. 207-08).

**(5) Residual Functional Capacity ("RFC") Assessment dated October 28, 2001.** Dr. Selbert G. Chernoff found that claimant was able to lift 20 pounds occasionally and 10 pounds frequently. (Tr. 240). He could stand/walk at least 2 hours in an 8-hour workday. He could sit for less than 6 hours in an 8-hour workday. He had limited push/pull ability in his lower extremities to six feet.

Claimant could occasionally climb ramps and stairs, balance, and stoop; occasionally to never kneel, and never climb ladders, ropes or scaffolds, crouch or crawl. (Tr. 241). He was to avoid concentrated exposure to vibration and hazards, such as machinery and heights, because he could not walk on uneven surfaces. (Tr.

8

243).

**(6) Medical Evaluation from Office of Disability, Office of Evaluation by Dr. Chernoff dated October 28, 2001.** Claimant complained of left knee pain which limited his standing, walking and sitting. (Tr. 247). Based on claimant's medical records, Dr. Chernoff opined that his complaints of pain and limitations were credible due to ligamentous tears and stretches that had produced an unstable knee. (Tr. 248).

**(7) Claimant's Administrative Hearing Testimony.** At the hearing on January 14, 2003, claimant was 41 years old. (Tr. 26). He had completed the ninth grade.

Claimant had injured his left knee in April, 1997, while working for Falcon as a derrick hand. (Tr. 28-29). He testified that he went back to work for two more hitches, and did not return after that. (Tr. 30). He stated that he had attempted to work afterwards for a pool company, on a farm driving a tractor, and running crawfish ponds, but his knee kept bothering him. (Tr. 30, 35).

Regarding complaints, claimant testified that his knee popped out when he sat for too long or climbed steps. (Tr. 33). He stated that when his knee popped out, he would push it knee back into place, but sometimes had to have other people help him. (Tr. 33). He also complained that his knee started hurting after he stood too long or walked around the yard.

As to restrictions, claimant stated that he could stand for about five or ten minutes, then had to sit a little while. He reported that he had problems with standing on a concrete floor. (Tr. 36). Additionally, he said that he had fallen a few times because of his knee problems. (Tr. 33-34).

For his complaints, claimant testified that he took Lortab, Celebrex and Soma. (Tr. 34). He said that it helped "to the most part of it." He reported that the Lortab gave him a lot of energy, then made him want to sleep. He stated that he sometimes had trouble sleeping because of pain, which is why he took Soma.

Regarding activities, claimant testified that he was able to drive, but had problems with his knee because he could not straighten it or put pressure on it. (Tr. 35). He reported that he did some dishes at home, but that was about it. (Tr. 33).

**(8) Administrative Hearing Testimony of Claimant's Wife, Shannon Lasseigne**. Claimant's wife testified that claimant was not very educated and had problems with reading and spelling. (Tr. 37). She reported that he had tried to help her with housework, such as doing the dishes, but that his knee would pop out of place. (Tr. 38). She stated that his knee popped out often, like five to eight times a day. She said that he put it back in himself sometimes, but that she or the kids had to do it for him occasionally.

**(9) Administrative Hearing Testimony of Harris Rowzie, Vocational Expert ("VE").** The ALJ posed a hypothetical in which he asked Mr. Rowzie to a assume a claimant with a marginal education who was 41 years old and had the same work background as claimant, and had difficulties with his left knee where he could stand between two and six hours in an eight-hour workday, and sit less than six hours in an eight-hour workday, with the ability to get up and down some. (Tr. 39-40). He clarified that such claimant could attend and, by alternating, could work an 8-hour day. (Tr. 41). In response, Mr. Rowzie testified that he would be limited to sedentary work as a laborer, except construction, of which there were 49,000 jobs nationally, and assembler, of which there were 40,000 jobs nationally. (Tr. 41). He also said that claimant might be about to do 10 to 15% of hand packager jobs, of which there were 105,000 jobs nationally. (Tr. 42).

**(10) The ALJ's Findings are Entitled to Deference.** Claimant argues that the ALJ erred in failing to properly reflect the claimant's limitations in the hypothetical questions posed to the vocational expert, and (2) the ALJ failed to properly consider the testimony of the VE regarding his employability given the production demands of the positions identified by the VE.

First, claimant asserts that the ALJ's hypothetical questions made an assumption regarding sit/stand exertional limitations which was not supported by the

RFC assessment by Dr. Chernoff. (rec. doc. 11, pp. 4-5). In the RFC assessment, Dr. Chernoff indicated that claimant could stand and/or walk at least 2 hours in an 8-hour workday and sit less than about 6 hours in an 8-hour workday. (Tr. 240). When the ALJ posed his hypothetical to the VE, he included these same limitations: "he can stand somewhere between two and, two and six hours in an eight hour day. And he can sit somewhere less than six hours in an eight hour day. Then necessarily he's going to have to get up and down some. . . . My hypothetical would that he can attend and, by alternating can work an eight hour day." (Tr. 40-41). In response to that hypothetical, the VE testified that claimant would be able to perform sedentary work as a laborer, except construction, and assembler. (Tr. 41). As the ALJ's hypothetical to the vocational expert reasonably incorporated all disabilities of the claimant recognized by the ALJ, and the claimant or his representative had the opportunity to correct deficiencies in the ALJ's question, the ALJ's findings are entitled to deference. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

Additionally, claimant argues that the ALJ failed to consider the VE's testimony that claimant "would face great difficulty with the identified job positions if he had to meet any production quota that may apply." (rec. doc. 5, p. 5). However, that testimony regarding production quotas was in response to claimant's attorney's

12

hypothetical assumption that claimant's knee popped in and out continuously. (Tr. 43-44). This testimony was rejected by the ALJ, which is within his discretion. The ALJ is not bound by VE testimony which is based on evidentiary assumptions ultimately rejected by the ALJ. *See Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir.1985); *Falls v. Apfel*, 2000 WL 329233, *7 (E.D.La.2000).

The record reflects that the ALJ considered the testimony of claimant and his wife regarding his knee popping in and out. (Tr. 16). However, the ALJ noted that claimant was still able to take care of his personal needs and grooming, prepare his own meals, perform some household chores, feed the chickens twice a day, play with his dogs and pigeons twice a day, visit relatives and friends occasionally, and drive sometimes. (Tr. 16, 33, 140-43). It is appropriate to consider the claimant's daily activities when deciding the claimant's disability status. *Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995). Thus, the ALJ's decision to reject the assumptions made in the attorney's hypothetical is entitled to deference.

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk

of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.** *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).

Signed this 4 day of October, 2005, at Lafayette, Louisiana.

COPY SENT:
DATE: 10-5-05
BY:
TO: TLM
CMH

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE